My name is Meredith Walker and I'm here on behalf of Appellate Leander Independent School District. We are here today because the Special Education Hearing Officer in the underlying due process hearing and the District Court made an erroneous finding of law in finding that J.M., the student in question, is eligible for special education and related services under the Individuals with Disabilities Education Act, as he did not demonstrate a need for specially designed instruction. There is no dispute in this matter that J.M. has a qualifying disability, meaning the first prong for eligibility. He has attention deficit hyperactivity disorder and a specific learning disability in written expression, which is also known as dysgraphia. Essentially this means he has trouble paying attention and he would prefer not to do paper and pencil tasks. He also has developmental coordination disorder, which is also known as dyspraxia. I have a question about the relationship because he was getting 504 accommodations. I don't quite understand the difference in what's available to a student with 504 versus being eligible under IDEA. I mean, for example, I know some students are able to get extra time on tests, you know, even state standardized tests. Do you have to be IDEA eligible for that or can you get that even under 504? So you don't have to be IDEA eligible to get that. Under the regulations for IDEA, it defines specially designed instruction or special education as specially designed instruction. And that definition is adapting to the needs of the child as appropriate, the content, methodology, or delivery of instruction to meet the unique needs and ensure access to the general education curriculum to ensure that the student can meet the school district standards. So when you're looking at the difference between accommodations under Section 504 and special education or specially designed instruction under the IDEA, the difference is going to come down to whether you're adapting the methodology of instruction or you're modifying the curriculum. Just providing a student with an accommodation, such as your example, Judge Costa, about giving them extra time on tests or perhaps they need preferential seating, we could go on and on with the list of accommodations that are available under Section 504. But so the 20, it seems like the big issue here, I mean, I know it's not at the stage of what the IEP would be, but it's about this extra time of special ed instruction. I mean, that what you wouldn't get under 504? No, you would not get specially designed instruction. You would not get direct inclusion under 504. And the point that the district is making here is that while it was included in a draft IEP, the IEP was never implemented in this case. And the student went on to finish fourth grade with A's and B's on grade level doing very well. So when you are accessing your education in that manner and you are making good grades, you're passing your state standardized test, then you don't meet the second prong of eligibility under the IDA, and that's whether the student actually needs the specially designed instruction. And a child who only needs- One mystery of this case, I mean, there's points both sides can make about whether the second requirement was met. Between the January and February meeting, there was just a stark change in teachers' and other individuals' assessment of the child. What explanation do you have for why that change was so stark in just a month's time period? Well, we don't actually believe that the change was actually that stark, but what happened was after the January ARD Committee ended in non-consensus, under the Texas Administrative Code, the parties were supposed to, or at least the school district members of the ARD Committee, were supposed to go back and look at information, gather data. And there was about approximately a two-week span between that ARD Committee meeting and the second ARD Committee meeting that took place in the middle of February. And one of the disagreements that Mom and Dad had with the IEP that the district had proposed was the goals. And because Mom and Dad were focusing on the goals, when the ARD Committee member or the school district members of the ARD Committee got together to look at the goals and to redraft the goals in order to make them amenable or acceptable to Mom and Dad, they realized that they were drafting goals that were above grade level already. And specially designed instruction under the IDEA is not meant to maximize a student's potential. It's not meant to take a student above grade level. Specially designed instruction in the definition under the IDEA is simply to ensure that the student has access to meet the school district standards. But those seem like disagreements about what the IEP would provide, which is really a different question, wouldn't you agree, than whether you're eligible? No, because if the only goals they could come up with, because he was already performing on grade level, was to take him above grade level, then he wasn't evidencing a need under the IDEA, under the second prong. So there was no specially designed instruction. What about his writing? You can be on grade level generally, but you have this writing problem with handwriting. Right, but handwriting under the IDEA and in Texas is dealt with under occupational therapy, and that's a related service. So you actually have to have a different need to make you eligible under the IDEA before you're entitled to a related service to deal with handwriting. In fact, his handwriting could be dealt with and was being dealt with through accommodations under Section 504, because he had the ability to use a tablet or other electronic devices in order to complete his work. And in classes where he wasn't able to use that, for instance, math might not lend itself as well to that, he had the ability to use, for instance, graph paper. My challenge really goes to your opening remark, which is that there's an error of law here. The way the record looks to me, that the hearing officer did have two days of hearing, 16 witnesses, and ultimately credits the school district's January 11 determination of need, then the IEP determination of need, then the February 11 addendum determination of need, over this recess where the school district decided, in fact, he didn't have a need. And then, is it Judge Sparks? Yes, Judge Sparks. Judge Sparks, he looked at it de novo, right? That's his standard review, and he comes to the same factual conclusion, that the school district was right originally to have determined three times the child needed special ed. How would we overturn that? So I think the Court can overturn that, because when you look at the special education hearing officer's decision, we don't believe that it's entitled to deference, because we believe that the special education hearing officer completely misunderstood the law with respect to eligibility and need, and misunderstood and misapplied the law and made erroneous conclusions. For instance, when you look at the special education hearing officer's decision, he found eligibility in order to remediate JM's disabilities. He actually said in his decision, it's not too late to assist JM in overcoming his special needs. But as this Court determined in Hovum, Klein vs. Hovum, or Klein ISD vs. Hovum, I apologize, the Court said that the IDA does not exist in order to remediate a student's disabilities. And the hearing officer found he had a need because he needed to overcome his special needs. The hearing officer also said that JM's educational need is learning how to better process his ideas to provide him with a greater ability to do so. In the AD vs. Alvin ISD case at the district court level, this Court affirmed it eventually. The district court said that achieving a student's maximum potential is wholly lofty, but school districts are not and cannot be required to maximize the potential of every student. Right, but whether or not the hearing officer made remarks that were aspirational, it also ultimately simply said the school district three times said he needed special ed. Right, he absolutely did, but the hearing officer also misunderstood and applied and made an erroneous conclusion of law with respect to what need means. In his decision, or I apologize, during the underlying due process hearing, he specifically said, let's talk about the first prong, if there's a determination, if there's a disabling condition is the first prong, and the second prong is that it adversely affects educational performance. The adversely affects educational performance is not what you look to when you determine whether a student has a need. Maybe start just basically for me to understand better, because the statute doesn't define need and the regs don't. So can you point to our court's best authority on, because the word need you wouldn't think is that confusing. What's the best circuit case that says this is what need is? So AD versus Alvin Independent School District is by far completely on point and dispositive in this issue, we believe. And under AD, the student had attention deficit disorder, and the parent requested a due process hearing after the school district determined that he was not eligible. The student had behavior problems, including hitting, throwing, obscene language, disruptive and disrespectful behavior, but he nevertheless passed eighth grade with grades between 73 and 95, and he met the tax test. The tax was the predecessor to the state of Texas assessment readiness test, also known as the STAR, which essentially lets school districts know whether their students are mastering curriculum in the Texas essential knowledge and skills. And the district court again said that the passing grades and his tax tests were critical indicators that he was receiving a free appropriate public education, and this court affirmed noting the student's passing grades and his success on the tax test. So that's what we have here. Well, but I'm not asking for factual similarity. What's the rule of law you draw from AD is do need equals what? So there aren't very many cases. I'm not sure that there are actually any Fifth Circuit cases that look at the difference, what a student needs and how that's defined when you look at the difference between 504 accommodations and specially designed instruction under the ITDA. So if there is no clear statement, it looks like AD and DL are two cases about eligibility, essentially deferred to the professionals as to need. And as I read the record, that's exactly what this hearing officer did. And then Judge Sparks did. He said you, the school district, three times said the student needed it. And then you had this fourth meeting and you reversed yourself. And I don't credit that. To me, that's just a fact determination. But when you look at what was in the student's IEP that they were going to implement, the student's IEP consisted of accommodations which are available under Section 504. The IEP was never implemented. And JM went on to pass fourth grade with As and Bs. He met the district's diagnostic reading assessment level. He was on level with respect to words permitted in reading. He was on level with respect to his writing, getting a two on the district's rubric. So he did not need what was set forth in the proposed IEP. That was never implemented because he passed fourth grade. And he did so with flying colors. Okay. So that is the emphasis I drew from your brief, that in hindsight an argument can be made that he did well and, therefore, he couldn't have needed it at the time that it was determined. That's absolutely right. What's your best case that I thought D.L. had some dicta or language that we don't assess need using hindsight? Because it's perfectly possible that the parents just, therefore, had to pour compensatingly time into this child and, therefore, wonderfully he did well, but that doesn't reduce the school's self-determined need at the first place. But there's no evidence in the record as to what the parents were doing. Right. But that's not their burden. It's your burden to show that two different fact finders were wrong. I understand. However, at the initial due process hearing, plaintiffs bore the burden to establish that he had a need for specially designed instruction. And they had three expert witnesses, and not a single expert witness could identify for the special education hearing officer what specially designed instruction J.M. needed in order to access his education. But you came up with one, and then the IEP person actually called and said, let's go. Right. So we know what the IEP was. And, again, the IEP took him above grade level. For instance, one of the goals that was written for him, there were two goals in the original IEP. The first goal was to take him to reading at 130 words per minute. That was an end-of-the-year fourth grade standard. At the time the IEP was written, he was reading at 93 words per minute, which was within the middle-of-the-year standard set by Leander ISD. So when you look at the definition of specially designed instruction under the regulations, he was already meeting district standard. And, as such, he did not need specially designed instruction. The second goal in his IEP was to take him to getting a three on the district's rubric for writing. He was already making a two, which, again, was the district standard at the middle of the year. And so both of the goals, the only two goals, in fact, that were in the proposed IEP that was never implemented, took him above grade level. And so we directed the court back to the federal regulations implementing the IDEA, which says it's for students to ensure that they need the modified instruction or adapt the content and methodology in order for them to meet district standards. If the student's already meeting district standards, then they do not need specially designed instruction by definition. Thank you, Counselor. You have more time or continue? You have a few seconds left. Ms. Duke? Or is it Ms. Kerr? Ms. Kerr. Ms. Kerr first. Good morning, Your Honors. Ms. Kerr representing the family, and I would note that Ms. Lee-Sam is in the courtroom today. Your Honors, we believe the court should affirm this case. The district court committed no clear error. The district court did not abuse its discretion. I'd like to address three issues with the court. First of all, the district court reviewed the very thorough report from the hearing officer, and the district court correctly applied the statutory requirements. The statutory requirements under the IDEA do not include what would be called a significant screener. In other words, whether need is substantial or mild is not precisely in the statute regarding need. Secondly, in today's classrooms, we have to look very carefully at what specially designed instruction means, and I'll address that. And finally, I think it's important to note that the district court correctly addressed the hearing officer's credibility determinations. With respect to the statute itself, the court is correct that the statute at 20 U.S.C. 14013 uses the word need. There is no adjective. There is no modifier to that term. Elsewhere in the statute and regulations, there are indicators, however. In 20 U.S.C. 1412A3, which is the statute that explains the responsibility of school districts to identify children with special education needs, it states that all children with disabilities, regardless of the severity of their disabilities, are to be identified. So that gives us some indication that Congress was not making a distinction such as we have to have a child who's really, really severe, or that children with mild or moderate disabilities are to be excluded. This child was evaluated by the school district. Clearly, the school district found three times that this child had disabilities and wrote an IEP for him. One of the areas that they identified was a specific learning disability. The statute gives us, again, a little guidance about what is meant by need, because the definition of specific learning disability is that a child with a specific learning disability, which the district concedes is one of the disabilities, means a child who has an imperfect ability to listen, think, read, write, spell, et cetera. With your awareness of all the witness testimony from that two-day hearing, what would you just as succinctly as possible say are the three strongest facts showing that the child had a need for special education? Yes. The child's needs are, of course, identified in the IEP. I know, but I'm asking you to identify the three strongest facts. Yes, sir. The biggest need was with respect to the writing. The child's writing skills, as measured by a test called the visual motor integration test, his writing skills were at the first percentile across all evaluators. School district occupational therapist Holly Cardell testified to that, as did private evaluators. Secondly, the child had a need in terms of reading, reading fluency. His reading fluency was identified in the record at Record on Appeal 1727 as a 77. His reading rate, an 81, at the Record of Appeal 1748. He failed the district benchmarks in reading as he did in writing and math. His reading, according to Sharon Holmes' comments at the January 25th meeting, at the tape for that meeting, Minute 151 and 202, reading fluency needs to be looked at. We need to write a goal on fluency, and we can't address it with specialized instruction. And then the other issue was one with respect to math. He did fail the math benchmarks, and he had math fluency in the record at Record on Appeal 1727 of a 79. And this child had average IQ. There's no debate he had average IQ or a little bit above. And finally, there was a concern about behavior, which is best expressed by Ms. Schulte, who identified him with somatization, anxiousness that made him sick. She said at the January, I'm sorry, at the February 23rd meeting, this is a school district psychologist, Ms. Schulte, and she said, I have not wavered. I would have shown up at that first ARD with a behavior goal. And that's at the February 23rd, 16 tape, Part 3, 22, Minute 2240. Those are needs, Your Honor, needs that needed to be met. I'm a little confused that the benchmark scores were so low. I've seen that. And yet the grades are so good. Are the benchmark tests not part of the grades? Is that why there can be that difference? In other words, I don't see how you get that low of scores if it counted and still get an A. They must not count. It's kind of confusing. Part of the reason is that the classrooms of today are different. Classrooms of today allow children to redo tests. And JM Reed did many tests and many assignments. So comparing just the classroom grades today is a lot different than it was in 1982 when Rowley was decided. The second thing is that Ms. Beasley was a special education teacher. So measuring how she graded and often, you know, had the student explain what he was trying to give on an assignment, again, is something that we might not have seen in regular classrooms years ago. But this leads us into the discussion I wanted to mention about the specially designed instruction. So what happens here is we have to look at this child and say, does this child qualify under IDEA? And the teachers, including Ms. Schulte, including Ms. Beasley, these teachers qualified him in January. That team all agreed the child was eligible. There was no dispute. That IEP very clearly says he was not just that he met first prom, but that he needed an IEP. That's why they wrote one. And that IEP, for the record, is at 1747. And the very first page, it says he qualifies under the categories and he needs special education. So that team of teachers, they knew what they were doing in the classroom. They made that decision to qualify him with that knowledge. And they agreed with the parent that he needed more. He needed 20 minutes a day of direct help. He needed the occupational therapy services. He needed help in math. He needed to work on the reading fluency. And he needed to work on the writing. With respect to the issue of how he did the rest of the year, number one, we were in litigation. Number two, the child's needs have to be measured, as this court decided in D.L., at the time that we're looking at the evaluation. So is that so eligibility case law is different than appropriateness case law in that regard? I think so, yes. So when you're looking at eligibility, you're looking at, you're always looking at a point in time. Because in this case, as this case shows, the child's needs were determined and he was deemed eligible. Then other events happened. But you're still going back to his eligibility point in time. But in cases that assess that are challenges to the content, it does seem like courts begin to look at, well, what happened during the use. Is that fair to say? Right, because you're looking at what is called implementation of the IEP. So, for example, how it's going, are people doing what they're supposed to, is the child getting the sufficient services? Those are implementation cases, not eligibility cases. Do you have a strong case, circuit level, that says eligibility and need is a fact determination? I mean, I guess I'm wondering about who's got the burden of production and standards of review from the hearing officer. Is there a case that sort of clarifies that? And then it gets up to a circuit court. What I would say is this. In terms of cases that assist, would assist this court, this is an unusual fact pattern. But Judge Sparks correctly analyzed it, and Judge Sparks has a lot of experience in special education. He basically looked at it and said, the hearing officer reviewed the record. I don't find any mistakes in the hearing. I don't find mistakes, you know, like he excluded evidence or something. He reviewed the fact that the hearing officer considered the teacher's testimony and their comments. So you look at what you would look at in an implementation case, you look at what the teachers say, and he did, and then he said what they said in January at the meeting, what they wrote in the IEP and the individual evaluations, those are consistent. The second evaluation with the first evaluation and the IEP. What's not consistent is what they said in February and in front of the hearing officer. So I think the standard for looking at the eligibility, you would look at, I think, three things. One is you cannot exclude a child because the child's bright and this child was bright. And in terms of the eligibility, this court has examined that in the Elvin D case and in D.L. Those cases are a little bit different because there was a disagreement from the get-go. The teachers didn't think the child was eligible. Here we have the teachers three times saying. So in each of those cases we upheld the determination of non-eligibility that the school district had always had. Right. You're saying this is different because the school district three times said he had a need and the two fact finders said we credit that. Yes, and they did credit that. In fact, Judge Sparks was very clear to credit the teachers in terms of what they had decided in the original evaluation. The second issue is that in terms of Rowley, sometimes there's references to Rowley in eligibility cases. Rowley is not an eligibility case per se. Actually, the teaching from Rowley is that a bright child can make A's and B's and have an IEP. Amy Rowley was very bright. She had an IEP and she made A's and B's. So obviously children with those characteristics can be qualified in special education. The client's son, I try to figure it out, I think is probably definitely in middle school now. What is the ultimate outcome in this case if you prevail? You want an IEP for middle school still addressing this or is it just really all about the attorney's fees for what happened a number of years ago? Well, we didn't appeal, but essentially the outcome of this case would be a determination that the child was entitled to an IEP and the parents were correct and they prevailed correctly before the hearing officer. But at least in the elementary school. At least in the elementary school. So anecdotally I will say he's in seventh grade now and he does have an IEP still in a different curriculum, different school. I also wanted to mention that with respect to the definition of need, which a question was raised, I think in our brief we cited to the But IEP now is of no relevance whether it's even in the record or not. It is not. That's hindsight evidence. It's outside evidence, yes. But not just outside, but it's hindsight which you're critiquing them for using. So you just, right, that would have no relevance. No, no, I was just informing the court. It would not be relevant. With respect to need, however, I would refer the court to the Weber article which was referenced in our brief that is appropriately called the eligibility mess. And Professor Weber gives a very nice explanation about the solution of how to examine eligibility cases. And he says, quite correctly, you have what is really a three-part eligibility determination. Sometimes people say two because one includes the condition and then the second one is the adverse performance. So in this case there wasn't really a disagreement about that first part. It was all about the need. But the point that Professor Weber makes at page 21 of his law review is that accommodations, modifications in our classrooms today, or other types of educational assistance such as having a special ed teacher in a regular ed classroom just because she's both licensed in both, we have to keep those in mind when we're looking at eligibility today. And that the courts should really look at the fact that Congress did not put a limitation. Congress did not say, you know, this type of need or this level of need. And he refers us back to some of the early jurisprudence or the jurisprudence around the Americans with Disabilities Act when people were concerned about whether or not you could qualify under the ADA. And then Congress stepped in and said, we didn't put a limit. And it's kind of the same situation here. So unless the court has other questions, that is what I have. Thank you very much, counsel. And now we'll hear from Mr. Duke, I think, before. I did yield time for my amici. Yes, no, that's right. He has three minutes. Thank you. Brandon Duke on behalf of the amici, and may it please the court. So amici agree that the district court was correct to determine that JM was eligible pursuant to IDA. And we would ask that the court reject Leander's attempt to rescind JM's ability here and avoid his child find obligation. Amici and both of our briefs put forth the fact that the state of Texas and Leander specifically have failed in their child find obligation for almost 15 years as a result of the 8.5% cap that was put in place under the PBMAS monitoring system. And importantly here, with respect to this case, the cap was still in place in February 16 when Leander revoked or made the alternative determination with respect to JM's eligibility for special education services. That cap was put in place in 2004, and the Houston Chronicle did not publish and publicize the fact of the cap until September 2016, so after the relevant facts here and the special education due process hearing. And the law that overturned the cap was not passed until, I believe, May of 2017. The 2017-2018 year was the first year without the cap. So in this context, Leander's actions that resulted in what the district court found a shocking change to JM's eligibility all occurred while the cap was in place. And we think that JM's experience in this case reflects the broader decrease in Leander's special education identification rate, which is detailed in the amicus brief, specifically in DRTX's brief. We lay forth the decrease that happened right after 2004 and how it continued to remain artificially low through 2016 when the relevant facts occur here. Separately and moreover with respect to Section 504, we think allowing district courts to ignore their child find obligations where they have provided some accommodations under 504 would eviscerate the child find obligation because virtually all students identified under IDA are also eligible under Section 504. And we specifically would point out OSEP's concern that was raised in their monitoring letter, and I'll just quote from it, that they raised concerns about the interaction between Section 504 and IDA and the possibility that Section 504-related aids and services were used to deny the identification of children suspected of having a disability. And this was based off of evidence, data, and monitoring that occurred throughout the state, including within Leander ISD. Before you finish, would you point to any different case as to the clearest articulation of when a child needs special ed? We would defer to the parties. We don't think there is a clear case. We think that the case is cited by both sides, put forth the relevant factors that courts consider, but I do think it's an issue of fact. Okay. Thank you. Thanks. Thank you. With respect to amicus and their arguments regarding the Texas Education Agency cap, it's a complete red herring and not relevant to the court at all. There's no evidence in front of the court that Leander ISD denied J.M. eligibility because of any cap by the TEA or that the TEA ever instructed Leander ISD to do anything other than comply with the IDEA. In fact, the IDEA stands for the Individuals with Disabilities Act, so we're not looking at caps and what TEA did. We're looking at the student and his individual needs at the time. And if we're going to look at J.M.'s individual needs at the time, since there was a discussion regarding hindsight and whether we can look at how he did the remainder of the year, I think what the court should look at is what he was doing during the relevant period of time, which would have been the third and fourth six weeks. During the third and fourth six weeks, he was making A's and B's, high B's, low A's. And at that time, during January and February of 2016, he was at the middle of the year. With respect to words per minute, he was on track. He was reading at a 40 instructional under the diagnostic reading assessment, which, again, was on grade level. And as I noted earlier, he was on a two with the district rubric, so with respect to his writing. So the disabilities that J.M. is advocating he needs special education for, the evidence in the record shows at the relevant time frame, in that January and February of 2016 time frame, he was absolutely on grade level. What about the midyear assessment scores that were so low? And I was just about to get there. So the benchmarks are the only measurable performance outlier during J.M.'s fourth grade year. When you look at the definition of a benchmark, it's a standard or point of reference against which things may be compared or assessed. And in the district's case, the district standard was where students should be at the end of fourth grade. So it's not surprising that a student in the middle of his fourth grade year is not meeting the district's expectations of where he should be at the end of the year, because that's what it's measuring. So it can be used to help determine how to differentiate instruction. There was testimony that the teachers were so, I think, shocked even at the result. Because he was a bright student and they were surprised that he didn't do better. However, not meeting a benchmark for the end of the year, or I'm sorry, for the middle of the year, doesn't mean he wasn't functioning on grade level. It just meant he wasn't where he was supposed to be at the end of the year. And it certainly doesn't evidence a need for specially designed instruction. And if you go and listen to the recording of the ARD committee meeting and the teacher's commentary on it, they stated that he didn't show his work on his paper and he didn't bubble in the answers correctly from what he had on his paper. And so the teachers, not only did they say they were shockingly low, but they also testified or said on the recordings during the ARD meetings that they weren't even sure that it was an accurate picture of where he actually was. So the benchmarks, because of what they are, they're just used to assess where a student is and where a student needs to be. We don't believe those are indicative that JM needed specially designed instruction. Is there anything in the record that suggests what the typical grade is? Because, I mean, you do hear some of these schools, I used to teach in one, you know, 80% of students get A's or B's. So then it's not that telling. If only half the students get A's or B's, it's more telling. There is not anything in the record, but there is plenty in the record showing the criteria that I gave you with respect to his reading and his writing. There's plenty of evidence in the record that shows he was exactly where he needed to be with respect to his DRA and exactly where he needed to be with respect to his writing. With respect to the commentary about Ms. Beasley being a special education teacher, she specifically testified that she did not draw on that experience in teaching JM. And Ms. Kerr also mentioned the fact that JM was able to redo tests. The evidence in the record reflects that all students were able to redo tests. So that's not specially designed instruction. Because something that is available to all students in the general education curriculum doesn't constitute specially designed instruction. So for all of the reasons we've discussed today and all of the reasons set forth in our brief, we would respectfully request that the court reverse and render Judge Sparks' decision that JM is eligible for special education and related services because he was not demonstrating a need for specially designed instruction. Thank you. Thank you, counsel. The cases for today have been submitted. We will be in recess.